Cite as 2025 Ark. App. 129

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CR-24-221

| | |
|---|---|
| | **Opinion Delivered** February 26, 2025 |
| DARYL BRENT MCDANIEL<br>APPELLANT | APPEAL FROM THE MILLER COUNTY CIRCUIT COURT<br>[NO. 46CR-21-227] |
| V. | |
| | HONORABLE BRENT HALTOM, JUDGE |
| STATE OF ARKANSAS | |
| APPELLEE | AFFIRMED |

### KENNETH S. HIXSON, Judge

Appellant Daryl Brent McDaniel was convicted in a jury trial of three counts of rape, four counts of second-degree sexual assault, and one count of sexual indecency with a child. These offenses were committed by McDaniel against his then nine- to ten-year-old stepdaughter, Minor Victim (MV), during the years 2015–2016. For these convictions, McDaniel was sentenced to consecutive prison sentences totaling 205 years in the Arkansas Division of Correction.

On appeal from his convictions, McDaniel raises two arguments. First, he argues that the trial court erred in denying his request to order the State to specifically identify which testimony was associated with which count either during or at the conclusion of MV's testimony. Next, McDaniel argues that the trial court erred in permitting forensic

interviewer Kristi Kirkwood to testify about how child-forensic interviews are conducted, the typical stages of disclosure, and the reasons why a child may recant. We affirm.[1]

On September 22, 2012, the State filed an amended criminal information charging McDaniel with three counts of rape, four counts of second-degree sexual assault, and one count of sexual indecency with a child committed against MV during the years 2015–2016. As charged, these offenses require proof of the following elements.

Pursuant to Ark. Code Ann. § 5-14-103(a)(3)(A) (Repl. 2024), a person commits rape if he engages in sexual intercourse or deviate sexual activity with another person who is less than fourteen years of age. "Sexual intercourse" means penetration, however slight, of the labia majora by a penis. Ark. Code Ann. § 5-14-101(13) (Repl. 2024). "Deviate sexual activity" means any act of sexual gratification involving (A) The penetration, however slight, of the anus or mouth of a person by the penis of another person; or (B) The penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person. Ark. Code Ann. § 5-14-101(1). Pursuant to Ark. Code Ann. § 5-14-125(a)(3) (Repl. 2024), a person commits second-degree sexual assault if the person, being eighteen years of age or older, engages in sexual contact with another person who is less than fourteen years of age. "Sexual contact" means an act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks,

---

[1]On April 8, 2024, McDaniel's counsel filed a motion seeking the recusal or disqualification of Judge Stephanie Potter Barrett. The motion was passed to the panel for consideration with the submission of the case. Because Judge Barrett is not on this panel, the motion is denied as moot.

or anus of a person or the breast of a female. Ark. Code Ann. § 5-14-101(12)(A). Pursuant to Ark. Code Ann. § 5-14-110(a)(2) (Repl. 2024), a person commits sexual indecency with a child if, being eighteen years of age or older, and with the purpose to arouse or gratify a sexual desire of himself, the person purposely exposes his or her sex organs to another person who is less than fifteen years of age.

At a pretrial hearing, McDaniel noted that he was charged with multiple sex crimes and moved that during the testimony of his accuser, MV, the State identify which testimony goes with which count. McDaniel stated that this was necessary so he would be able to make appropriate directed-verdict motions if there was any deficiency in MV's testimony and for the jury to determine guilt or innocence on a particular count. The trial court ruled that the State was not required to do that and denied the motion. McDaniel renewed his motion at the outset of trial, asking again that during its direct examination of MV, the State be required to identify on which count it was eliciting testimony. The State responded that this would invade the province of the jury and that it was the jury's duty to listen to the testimony and determine whether there had been sufficient evidence to satisfy the elements of three counts of rape, four counts of second-degree sexual assault, and one count of sexual indecency with a child. The trial court again denied McDaniel's motion over McDaniel's objection that "we are entitled constitutionally, and as a matter of procedure, to know which testimony goes with which count." McDaniel later renewed his motion after MV testified on direct examination, after the State rested its case, and each time the trial court again denied the motion.

Also prior to trial, McDaniel filed a request for notice of the State's expert witnesses, the curriculum vitae of each expert, any reports or statements made by an expert witness, and the underlying facts or data forming the basis for their opinions. The State disclosed Kristi Kirkwood, a forensic interviewer who had interviewed MV about her allegations of sexual abuse. The State provided McDaniel with Kirkwood's curriculum vitae and informed him that although Kirkwood would not be testifying regarding her interview of MV, she would be called as an expert in the areas of forensic interviewing and the behaviors of child victims of sexual abuse. Kirkwood's curriculum vitae showed that she obtained a bachelor of arts in sociology in 2010; that she has extensive forensic-interview training; that she was a senior investigator for the Arkansas State Police Crimes Against Children Division from October 2011 through July 2019, during which time she conducted approximately one thousand forensic interviews using ChildFirst forensic interviewing protocol; and that she has been a forensic interviewer for the Texarkana Children's Advocacy Center from July 2019 through the present.

McDaniel subsequently filed a "Motion to Prohibit Presentation of Supposed Expert Testimony." In that motion, McDaniel alleged that the State's response was inadequate because it failed to include statements of its expert and also argued that Kirkwood's proposed testimony should be prohibited because it would be improper profile evidence as well as improper bolstering of his accuser. The State filed a response stating that there were no reports or statements by Kirkwood in connection with the case and that Kirkwood's testimony would be based on her years of education, training, and experience. The State

4

alleged further that because it intended to offer only general expert testimony from Kirkwood about forensic interviews and the five stages of disclosure—and not any specific testimony about MV or an opinion as to MV's truthfulness—this testimony was not improper profile or bolstering evidence under *Harper v. State*, 2019 Ark. App. 163, 573 S.W.3d. 546. McDaniel then filed a motion for supplemental discovery, arguing that because Kirkwood would be testifying from her own experiences, the State should be required to provide the records from Kirkwood's case files so McDaniel could cross-examine her on the basis of her opinions.

The trial court held a pretrial hearing on these issues and ordered to State to provide to McDaniel training materials and protocols on the "semi-structured narrative process and the child first" interview methods used by Kirkwood and other forensic interviewers at the Texarkana Children's Advocacy Center. The trial court ruled that Kirkwood's expert testimony would be permitted under *Harper* because her opinion would be limited to general terms with no specific references to the victim in this case. The trial court also denied McDaniel's request for Kirkwood's case-file history, stating that "that would probably be hundreds of cases" and that Kirkwood's testimony would be based on her training.

The testimony at the jury trial showed that MV's mother, Ruth Jackson, divorced MV's biological father, Matthew Nix, in 2011. In 2012, when MV was five years old, Jackson married McDaniel. Jackson, McDaniel, MV, and MV's brother moved into a three-bedroom duplex in Texarkana, Arkansas. Jackson had significant physical and mental-health issues that compromised her ability to be an effective parent, and McDaniel became the children's

5

primary caretaker.  McDaniel had MV call him "daddy," and McDaniel and MV developed a close relationship and spent a lot of one-on-one time together.

MV testified that McDaniel engaged in a pattern of sexually abusing her when she was nine to ten years old.  When asked how many times she had been sexually abused by McDaniel, MV stated, "Too many times for me to count.  Too many for me to remember.  I can't give you a list of every single time."  Nevertheless, MV went on to testify about numerous instances of rape and sexual assault.

The first incident of sexual abuse in Texarkana began when McDaniel drove with MV to a liquor store, bought some Fireball whiskey, and they came home. They were in the kitchen, and at McDaniel's urging, MV drank some of the whiskey.  While MV's mother was asleep in the back bedroom, McDaniel told MV she looked sexy and started tongue-kissing her.  MV testified that McDaniel then took her into the living room, removed her shorts and panties, and positioned her to where she was straddling him at eye level as he sat in a recliner.  For the next two or three minutes, McDaniel "moved his tongue around the outside and inside of [her] vagina."  He then let her down, put her hand on his penis, and had her masturbate him until he ejaculated.  After this happened, MV went to the bathroom and "got in the shower and . . . kept washing [her] body over and over."

The next specific instance recounted by MV occurred on the living-room couch, as McDaniel snuggled with her under a blanket.  While MV's mother and brother were sleeping in their respective bedrooms, McDaniel had MV masturbate him under the blanket.  Beyond that incident, MV testified that McDaniel had raped her many times in the living room.

When asked how many times, she responded, "[T]oo many." MV stated that sometimes McDaniel would put his penis in her vagina, sometimes he would put his mouth on her vagina, and sometimes he would put his mouth on her breasts.

MV testified further that McDaniel sexually abused her more than ten times during "naps" they would take in her parents' bedroom. She stated, "[H]e would put his mouth on my vagina[,]" and "he would put my hand on his penis." She also stated that more than once "[she] would be on [her] back and he would insert his penis into [her] vagina."

Finally, MV described an incident when McDaniel awakened her as she slept in her bedroom, removed her pajamas and panties, and raped her vaginally with his penis. MV stated further that McDaniel had sexually abused her "numerous times" in her bedroom by putting his mouth on her breasts and on her vagina and by putting his penis and fingers into her vagina.

MV also testified that there were occasions when McDaniel had sexually abused her in Texas. Most of these incidents occurred during trips she had taken with McDaniel to Dallas to pick up his children.

MV testified that during these years of sexual abuse, she would sometimes beat her stomach because she was afraid she was pregnant. MV also engaged in self-harm by cutting herself with knives and jagged pieces of glass, which she explained was a way of punishing herself because at the time she thought the rapes and sexual assaults were her fault. MV stated that she did not disclose the sexual abuse when it was occurring because she was

7

scared, she "didn't want it to be [her] fault," she loved McDaniel, and he told her he would get in trouble if she told anyone.

MV's mother and McDaniel divorced in 2017. In November 2020, MV told a teacher she had been molested. The teacher called the police, and an investigator was sent to question MV at her school. During that interview with the police investigator, MV denied the abuse. MV explained in her testimony, "Why would I tell my whole story to a random male I don't know?"

Four months later, in March 2021, MV was living with her father, Matthew Nix. MV asked her father to put her in contact with the police investigator to whom she had spoken before. Nix contacted the police and also notified MV's mother, Jackson. Jackson asked MV what had happened, and MV told her mother about the sexual abuse. The resulting investigation led to a forensic interview at the Texarkana Children's Advocacy Center and the filing of charges against McDaniel.

Over McDaniel's objection, forensic interviewer Kristi Kirkwood also testified for the State. Kirkwood did not mention MV in her testimony or the fact that she had interviewed MV. Kirkwood instead testified generally about the standard practice for conducting child interviews with alleged sexual-abuse victims, the typical five stages of disclosure, and the reasons a child may recant. Kirkwood testified that she has extensive training in forensic interviewing and the behavior of children who have been sexually abused and that she has conducted more than seventeen hundred forensic interviews. The trial court recognized Kirkwood as an expert.

8

Kirkwood described the interview process as kid friendly. She stated that there are protocols to follow and that she was trained as a forensic interviewer to use open-ended questions. Kirkwood stated that the interviewer is open to rewording questions if the child finds them confusing and that the child is always told to tell the truth. Kirkwood stated that the child is also told to correct the interviewer if she says something or repeats something that is inaccurate.

Kirkwood then testified about the five stages of disclosure: denial, tentative, active, recantation, and reaffirmation. Kirkwood testified that in the first stage of denial, the child denies that anything happened to the child for various reasons, including that he or she is not ready to talk about it. In the tentative stage, the child is still tentative about disclosing all the details but may feel like he or she needs to do something about it and may make a vague statement such as, "I don't want to go home today," just to see people's reactions. In the active stage, the child goes to his or her parent or counselor, tells the parent or counselor what happened, and says he or she is ready and willing to talk about it. The fourth stage is recantation, and Kirkwood testified that it is common in sexual-abuse cases for a child to recant his or her initial disclosure. Kirkwood explained the various reasons for recantation, which include that the person who abused them is someone they love and care about, that they do not want to see their family torn apart, or that they want their life to go back to normal. In the final stage of reaffirmation, the child who had previously recanted later comes back and reaffirms that these things really did happen. Kirkwood stated that every abused

child does not go through every stage, that every child does not recant, and that every child does not reaffirm.

Kirkwood also testified about "delayed outcry," which occurs when a child does not immediately tell anyone but reports the sexual abuse later. She stated that in her experience, it is rare for an abused child to immediately tell anyone and that it may be weeks or even years before the abuse is reported. Kirkwood stated that it is different for every child, but the reasons for this include that the child thinks it is his or her fault, the child fears he or she will get in trouble, the child is worried nobody will believe them, or the child still loves the perpetrator despite the sexual abuse. Kirkwood also testified that if sexual abuse is left untreated, it may lead to self-harming behavior.

On cross-examination, Kirkwood testified that the term "disclosure" as used in child sexual-abuse cases is a neutral term and means that the child made a statement. She stated that it is not within the scope of her job as a forensic interviewer to determine whether or not a child is telling the truth. Kirkwood stated, "Disclosure means a child made a statement and it is the jury's job to deliberate and decide whether or not they believe that . . . a child is telling the truth."

McDaniel testified in his own defense. McDaniel denied the allegations and denied that he had ever touched MV inappropriately.

The jury convicted McDaniel of three counts of rape, four counts of second-degree sexual assault, and one count of sexual indecency with a child, and McDaniel was sentenced

10

to 205 years in prison.  McDaniel appealed, and on appeal, he raises two arguments for reversal as discussed below.

    I.  *The Trial Court Erred in Refusing to Order The State to Identify Which Testimony Was Associated with Which Count*

McDaniel's first argument is premised on his claim that when a defendant is charged with multiple counts of the same or similar conduct, he or she is entitled to know what testimony is associated with which count.  That being so, McDaniel contends that the trial court erred in denying his request below to order the State to identify which portions of MV's testimony corresponded to which of the eight charges.[2]

McDaniel argues that he was entitled to this requested process under the Fourteenth and Sixth Amendments to the United States Constitution, which guarantees that he be informed of the nature and cause of the accusation and a unanimous jury.  *See Ramos v. Louisiana*, 590 U.S. 83 (2020).  McDaniel posits that not only did he have no way of knowing how to cogently move for a directed verdict on a particular count without knowing what testimony applied to that count, but there is no way to know whether the jury agreed on the

---

[2]The State asserts that this argument on appeal is not preserved for review, citing *Morrison v. State*, 2023 Ark. App. 70, 660 S.W.3d 682, where we stated that arguments not made below are waived, and the parties cannot change the grounds for an objection on appeal but are bound by the scope and nature of the objections and arguments presented at trial.  Although McDaniel clearly made this request multiple times below and each time was denied by the trial court, the State nonetheless argues that McDaniel has greatly revised and expanded his argument on appeal.  We, however, conclude that McDaniel sufficiently raised his claim below such to preserve the argument on appeal and that it would be hypertechnical to conclude otherwise.

same facts as to each count or whether the jury rested its conclusions on any of the allegations of sexual abuse that occurred in Texas.

McDaniel states that this issue is one of first impression in Arkansas, but he cites *Woertman v. People*, 804 P.2d 188 (Colo. 1991). In that case, Woertman was convicted of three counts of sexual assault of a child, and the Colorado Supreme Court reversed and remanded for a new trial, holding that it was error not to require the prosecution to elect a specific act of sexual abuse or, in the alternative, to provide the jury with a unanimity instruction where over fifty acts of sexual contact were admitted to support the three charges. In *Woertman*, the Colorado Supreme court wrote:

> In *People v. Estorga*, 200 Colo. 78, 81, 612 P.2d 520, 523 (1980), we said that when there is evidence of many acts, any one of which would constitute the offense charged, the prosecution must "individualize and select a specific act upon which it relies for a conviction, although the prosecution need not identify the exact date of the offense." Such an election "enables the defendant to prepare and make his defense to a specific charge, and assures that some jurors do not convict on one offense and others on a separate offense." *Id.*

*Id.* at 191.

McDaniel argues that the multicount structure of the amended felony information was clearly designed to obtain a "stupendously long sentence" and that he had a due-process right not to be deprived of his liberty without the unanimous assent of his peers. McDaniel argues that because the trial court refused to order the State to identify which testimony was associated with which charge, this case should be reversed and remanded for a new trial.

Questions of constitutional interpretation are reviewed de novo. *Williams v. State*, 2023 Ark. App. 501, 678 S.W.3d 844. For the following reasons, we do not agree that

12

McDaniel's constitutional rights were violated by the trial court's ruling that the State was not required to specifically identify which charge went to which part of MV's testimony.

A criminal defendant may not suffer the loss of liberty for an offense without notice and a meaningful opportunity to defend. *Jackson v. Virginia*, 443 U.S. 307 (1979). The notice requirement is satisfied by a charging instrument specific enough to (1) inform the defendant of the charge he is called upon to answer, (2) inform the court of a definite offense, and (3) protect the defendant against double jeopardy. *Clark v. State*, 2012 Ark. App. 496, 423 S.W.3d.122.

We conclude that the amended criminal information filed by the State and the jury instructions satisfied the constitutional notice and unanimous-jury requirements. The information charged McDaniel with three counts of rape, four counts of second-degree sexual assault, and one count of sexual indecency with a child, all of which were committed against MV during the years 2015–2016. The State did not have to prove specifically when each sex offense occurred because (other than the age requirements that were clearly satisfied) time was not an essential element of the offenses. *See Burnside v. State*, 2015 Ark. App. 550, 472 S.W.3d 497. The information cited the applicable criminal statutes and alleged the conduct that was committed in violation of the provisions therein. The jury was accurately instructed on the number of counts charged for each offense and the elements the State was required to prove. As acknowledged by McDaniel in his brief, the trial court verbally instructed the jury that the events having occurred in Miller County, Arkansas, was an element to be proved beyond a reasonable doubt. This was also included in the written

13

instructions provided to the jury. The trial court further instructed the jury that "all twelve of you must agree on the verdict" for each offense.

Although McDaniel has cited a Colorado case in support of his argument, he has cited no authority that is binding on this court. Nor has McDaniel made any argument that convinces this court that the State is required to specifically assign which testimony goes with which charged offense in the instance of a multicount information. The jury heard the testimony, evaluated the testimony, and unanimously found beyond a reasonable doubt that McDaniel had committed each of the charged offenses. And as stated, the jury was specifically instructed to consider only conduct that occurred in Arkansas; therefore, there is no likelihood that the jury convicted McDaniel of conduct committed in Texas as he suggests in his brief. We do not believe McDaniel was hindered in making his directed-verdict motions as to the charges, and he makes no claim that MV's testimony was not sufficient to support the elements of every count of every offense with which he was found guilty. Nor could such an argument prevail in light of MV's detailed testimony about repeated and sustained sexual abuse perpetrated by McDaniel against her occurring in the living room, her parents' bedroom, and MV's bedroom in the Texarkana, Arkansas, duplex where they resided during the relevant time frame.

We hold that the trial court committed no error in refusing McDaniel's request to order the State to identify which testimony was associated with which count. Accordingly, this point provides no ground for reversal.

14

II. *The Trial Court Erred in Permitting the So-Called Expert Testimony of Forensic Interviewer Kristi Kirkwood*

McDaniel's next point on appeal is that the trial court erred in allowing forensic interviewer Kristi Kirkwood to testify about how child forensic interviews are conducted, the typical stages of disclosure, and the reasons why a child may recant. Under this point, McDaniel argues that: (A) this was improper profile evidence; (B) this was improper bolstering of MV's testimony; (C) Kirkwood had a conflict of interest, and the probative value of her testimony was substantially outweighed by the danger of unfair prejudice; and (D) there were discovery violations, including the State's refusal to provide McDaniel with Kirkwood's statements and refusing to provide him with Kirkwood's case files.

A & B: Improper Profile Evidence and Improper Bolstering

McDaniel's first two assignments of error under this point are that Kirkwood's testimony was improper profile evidence and improper bolstering of MV's testimony. Based on our settled case law, we cannot agree.

The standard of review on admissibility of expert testimony is abuse of discretion. *Johninson v. State*, 317 Ark. 431, 878 S.W.2d 727 (1994). Abuse of discretion is a high threshold that requires that the trial court act improvidently, thoughtlessly, or without due consideration. *Hajek-McClure v. State*, 2014 Ark. App. 690, 450 S.W.3d 259. The general test for admissibility of expert testimony is whether the testimony will aid the trier of fact in understanding the evidence or in determining a fact in issue. *Id.*

15

McDaniel first argues that Kirkwood's testimony was improper because it amounted to profiling of the accuser for the purpose of demonstrating McDaniel's guilt. In support of this argument, McDaniel relies on *Brunson v. State*, 349 Ark. 300, 79 S.W.3d 304 (2000), where the supreme court reversed and remanded two first-degree-murder convictions based on the admission of improper profile evidence. In *Brunson*, the supreme court stated that testimony regarding a criminal profile is nothing more than an expert's opinion as to certain characteristics that are common to some or most of the individuals who commit particular crimes. In *Brunson*, the State's expert was allowed, using ten risk factors, to establish a profile on the predictability that a batterer will become a murderer and testified that Brunson fell within that profile. The supreme court in *Brunson* held that the admission of this testimony was an abuse of discretion in that it both mandated a conclusion and was unduly prejudicial. McDaniel also cites *Russell v. State*, 289 Ark. 533, 712 S.W.2d 916 (1986), where the supreme court held it was error to permit a psychologist to testify that a child's statements were consistent with sexual abuse.

McDaniel next argues that Kirkwood's testimony was also improper bolstering of the accuser's testimony. Citing *Hinkston v. State*, 340 Ark. 530, 10 S.W.3d 906 (2000), McDaniel correctly asserts that expert testimony on the credibility of a witness is an invasion of the jury's province. It is erroneous for the trial court to permit an expert to, in effect, testify that the victim of a crime is telling the truth. *Hill v. State*, 337 Ark. 219, 988 S.W.2d 487 (1999). McDaniel argues that while Kirkwood did not explicitly opine that MV was telling the truth

16

or that McDaniel was guilty, her testimony was designed to bolster MV's credibility and invaded the province of the jury.

We reject McDaniel's contention that the trial court abused its discretion in admitting Kirkwood's testimony on the basis of improper profiling or bolstering. Kirkwood testified only in generalities about the interview process and the typical stages of disclosure, but she did not mention MV nor give any opinion as to MV's truthfulness.

The seminal case on these issues, which was cited by the State below and relied on by the trial court in making its ruling, is *Harper*, 2019 Ark. App. 163, 573 S.W.3d 596. Harper was convicted of rape, second-degree sexual assault, and sexual indecency with a child. On appeal, Harper argued that the trial court should not have permitted the State to present expert Missy Davidson's testimony about the forensic-interview process and behaviors of child sexual-abuse victims. Harper claimed that the State should not have been allowed to present profile and bolstering evidence to attempt to explain or excuse the accuser's changing stories and that Davidson's testimony was improper bolstering of the accuser's testimony. We disagreed, and wrote:

> Davidson did not offer "profile" evidence about the type of person who reports sexual abuse, recants, and then reaffirms. Nor did she attempt to "bolster" K.S.'s testimony. Davidson never mentioned K.S.'s name during her entire testimony. Davidson, instead, testified generally about how child-forensic interviews are conducted, the typical five stages of disclosure, and the reasons why a child may recant. Davidson did not attempt to explain why K.S. recanted or that K.S.'s sexual-abuse allegations were credible or that K.S. fit the "profile" of a person who would recant abuse allegations.
>
> Our court has expressly held that expert witnesses may testify generally about forensic interviews and recantation. *See Sweeten v. State*, 2018 Ark. App. 590, 564

17

S.W.3d 575; *see also Hill v. State*, 337 Ark. 219, 225, 988 S.W.2d 487, 491 (1999) (holding that the DHS caseworker's testimony about the criteria DHS used to determine whether a child's sexual-abuse allegations warranted further investigation was proper and did not bolster the victim's credibility); *Davis v. State*, 330 Ark. 501, 508–09, 956 S.W.2d 163, 166 (1997) (holding that the circuit court did not abuse its discretion by allowing a family-service worker with DHS to give expert testimony that it was not unusual for child sexual-abuse victims to recant).

. . . .

Davidson gave generalized testimony about forensic interviews and recantation and did not testify specifically about K.S. Such testimony is proper expert-witness testimony, and we cannot say that the circuit court abused its discretion in allowing Missy Davidson to testify as an expert.

*Harper*, 2019 Ark. App. 163, at 5–6, 573 S.W.3d at 600–01.

As in *Harper*, Kirkwood gave only general testimony about how child forensic interviews are conducted, the typical five stages of disclosure, and the reasons why a child may recant. Kirkwood never mentioned MV's name during her testimony; she did not disclose to the jury that she had interviewed MV; she did not attempt to explain why MV recanted; and she did not state that MV's sexual-abuse allegations were credible or that MV fit the "profile" of a person who would recant abuse allegations. Kirkwood also testified that every abused child does not go through every stage nor does every child recant, and she stated that it is not her job to determine whether a child is telling the truth because that is the role of the jury. Based on our reasoning in *Harper* and the cases cited therein, we hold that there was no abuse of discretion in admitting Kirkwood's testimony because it was not improper

profiling, it was not improper bolstering of MV's testimony, and it did not invade the province of the jury.[3]

### C. Kirkwood Had a Conflict of Interest and the Probative Value of the Testimony was Substantially Outweighed by the Danger of Unfair Prejudice

Rule 403 of the Arkansas Rules of Evidence provides that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 extends to the exclusion of expert testimony. *See Graftenreed v. Seabaugh*, 100 Ark. App. 364, 268 S.W.3d 905 (2007).

McDaniel argues that Kirkwood's testimony should have been excluded because she had a conflict of interest. McDaniel states that although Kirkwood testified in general terms about the interview process and the behaviors of child sexual-abuse victims, she actually interviewed MV and was a participant in the investigation of this case. This, McDaniel suggests, made Kirkwood a biased witness and was grounds to prohibit her testimony.

We reject this argument for several reasons. First, in *Harper*, *supra*, upon which we relied in affirming the subpoints above, forensic interviewer Missy Davidson—as in this case— participated in the investigation and interviewed the victim, and we nonetheless held that Davidson's general testimony about the interview process, five stages of disclosure, and recantation was admissible. Additionally, although Kirkwood interviewed MC, she never mentioned the interview nor did she mention MC at all in her testimony. Thus, there was

---

[3]While McDaniel asks this court to overrule our holdings in *Harper* and *Sweeten*, our reasoning and analyses in those cases was sound, and we decline his invitation.

no danger of the jury being misled.  And finally, we do not agree that the fact that Kirkwood interviewed MV created any conflict of interest.  Accordingly, we hold that the trial court did not abuse its discretion in finding Kirkwood's testimony admissible despite McDaniel's claims of unfair prejudice or a conflict of interest.

### D.  Discovery Violations

McDaniel's final argument under this point is that the trial court should not have permitted Kirkwood's testimony as a result of alleged discovery violations.  In particular, McDaniel claims that the State should have been required to disclose statements made by Kirkwood as well as Kirkwood's case files.

Rule 705 of the Arkansas Rules Evidence pertains to disclosure of facts or data underlying expert opinion and provides:

> The expert may testify in terms of opinion or inference and give his reasons therefore without prior disclosure of the underlying facts or data, unless the court requires otherwise.  The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Arkansas Rule of Criminal Procedure 17.1(a)(iv) provides that the prosecuting attorney shall disclose to defense counsel, upon timely request, any reports or statements of experts made in connection with the particular case which is or may come within the possession, control, or knowledge of the prosecuting attorney.  Rule 17.4(a) provides that the trial court in its discretion may require disclosure to defense counsel of other relevant material and information upon a showing of materiality to the preparation of the defense.

20

McDaniel asserts that, notwithstanding his pretrial request for Kirkwood's reports and statements, none were provided. McDaniel asserts further that, because Kirkwood was basing her opinions on her on-the-job experiences, the trial court should have granted his request that the State provide him with Kirkwood's case files upon which her opinion was premised so her claimed expertise could be challenged on cross-examination.

The trial court has broad discretion in matters pertaining to discovery, and that discretion will not be reversed by the appellate court absent an abuse of discretion. *Banks v. Jackson*, 312 Ark. 232, 848 S.W.2d 408 (1993). We hold that the trial court committed no abuse of discretion in regard to these discovery matters.

With respect to Kirkwood's statements in connection with this case, the State asserted below that there were no such statements and that Kirkwood's expert testimony would be based on her extensive experience as a forensic interviewer. The State provided McDaniel with Kirkwood's curriculum vitae, which documented Kirkwood's extensive training in forensic interviewing and twelve-year career in the field. Kirkwood testified that she was basing her opinions on her professional experiences, which included more than seventeen hundred forensic interviews. Rule 17.4(a) provides that the trial court in its discretion *may* require disclosure to defense counsel of other relevant material, and McDaniel has cited no authority nor made any convincing argument that a trial court abuses its discretion in not requiring disclosure of an expert forensic interviewer's exhaustive professional case files as a prerequisite to that expert testifying in the case. We conclude that the trial court did not act improvidently, thoughtlessly, or without due consideration in denying McDaniel's request

21

for production of Kirkwood's case files, and we find no error by the trial court under this subpoint.

### III.  *Conclusion*

Having reviewed the record and McDaniel's points on appeal, we hold that none of the points presented have merit.  Accordingly, McDaniel's convictions are affirmed.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Jeff Rosenzweig* and *John M. Pickett*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christian Harris*, Sr. Ass't Att'y Gen., for appellee.