RENDERED:  JULY 25, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0429-MR

COMMONWEALTH OF KENTUCKY                    APPELLANT


                    APPEAL FROM GRAVES CIRCUIT COURT
v.                  HONORABLE KEVIN D. BISHOP, JUDGE
                    ACTION NO. 22-CR-00199


GARY CAMPBELL                              APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, CETRULO, AND ECKERLE, JUDGES.

CETRULO, JUDGE:  The Commonwealth of Kentucky appeals a Graves Circuit

Court order denying its motion to proffer expert testimony (pertaining to a child

victim's delay in disclosing sexual abuse) during the Commonwealth's case-in-

chief.  Despite finding error, we affirm.

**BACKGROUND**

In June 2022, a Graves County Grand Jury indicted appellant Gary Campbell ("Campbell") for first-degree sodomy (victim under the age of 12) and first-degree sexual abuse (victim under the age of 12). The alleged victim here ("child" or "victim") did not report any abuse at an initial interview in 2020, but subsequently made sexual abuse allegations during a 2022 interview. Further details of the allegations are not necessary for our review.

In April 2023, Campbell filed a motion *in limine* to exclude any mention of Child Sexual Abuse Accommodation Syndrome ("CSAAS") or the factors, signs, or symptoms relating to that syndrome. CSAAS is a 1983 theory that describes certain characteristics common to child victims of sexual abuse. Summit, R.C., THE CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME, *Child Abuse Neglect*, 7(2), 177-93(1983), https://doi.org/10.1016/0145-2134(83)90070-4 (last visited Jul. 21, 2025).

In response, the Commonwealth agreed that Kentucky courts had not previously admitted CSAAS evidence, but argued this was "because [CSAAS] ha[d] not been subjected to analysis for its reliability pursuant to *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)[1]]." The Commonwealth

---

[1] *Daubert* was adopted in the Commonwealth of Kentucky by *Mitchell v. Commonwealth*, 908 S.W.2d 100, 101 (Ky. 1995), *overruled in part on other grounds by Fugate v. Commonwealth*, 993 S.W.2d 931, 937 (Ky. 1999).

asserted, with the proper *Daubert* validation, it should be permitted to elicit limited CSAAS testimony.  The court disagreed, and after a hearing, the trial court excluded *any* CSAAS-related testimony.  The Commonwealth filed a motion to alter, amend, or vacate that order, but the court denied that as well.

In August 2023, the Commonwealth filed a motion *in limine* to introduce expert testimony pertaining to the victim's delayed disclosure through a clinical psychologist, Dr. Stuart Bassman ("Dr. Bassman").  Delayed disclosure is one of the five categories[2] of reactions or behaviors described within CSAAS, but the Commonwealth presented the theory as an independent, autonomous theory.  Campbell opposed the motion, asserting the court's prior order encapsulated and prohibited this evidence, and arguing Kentucky courts do not permit such testimony.  The court permitted the parties to present arguments specific to delayed disclosure.

In January 2024, the trial court held a pre-trial hearing pursuant to *Daubert* (the "*Daubert* hearing") to assess the delayed disclosure evidence.[3]  At

---

[2] (1) Secrecy; (2) helplessness; (3) entrapment and accommodation; (4) *delayed*; or (5) conflicted disclosure and retraction.  Summit, R.C., THE CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME, *Child Abuse Neglect*, 7(2), 177-93(1983), https://doi.org/10.1016/0145-2134(83)90070-4 (last visited Jul. 21, 2025).

[3] The record on appeal appears incomplete.  The trial court heard testimony from Dr. Bassman on January 5, 2023, and that hearing is included in the record.  However, after Dr. Bassman completed his testimony, the court continued the remainder of the hearing to January 11 because Campbell did not have a rebuttal witness present at that time.  It appears that the January 11 hearing took place via Zoom but it is unknown if Campbell presented a rebuttal witness that day;

that *Daubert* hearing, Dr. Bassman explained the prevalence of delayed disclosure among child sexual abuse victims, discussed the theory's acceptance and validation within the medical/scientific community, and emphasized that broad research shows delayed reporting of child sexual abuse is not indicative of deceit.

In support, the Commonwealth introduced nine exhibits; at least seven appear to be professional publications by medical professionals and/or child advocates specifically analyzing disclosures by child sexual abuse victims. The trial court utilized/discussed only one exhibit in the order on appeal, Commonwealth's Exhibit #3 ("2005 Study"): Kamala London,[4] Maggie Bruck, Stephens J. Ceci, Daniel W. Shuman, *DISCLOSURE OF CHILD SEXUAL ABUSE, What Does the Research Tell Us About the Ways That Children Tell?*, PSYCH., PUB. POL'Y, & L. VOL. 11, No. 1, 194-226 (2005).

Ultimately, in a March 2024 order, the trial court denied the Commonwealth's motion and excluded the delayed disclosure evidence in its case-in-chief. The court determined, in relevant part, (a) Kentucky caselaw prohibits all CSAAS testimony including delayed disclosure evidence; (b) the delayed disclosure testimony is inadmissible class evidence; (c) the science presented by

there is no mention of a rebuttal witness in the order on appeal, and the docket sheet in the record merely states, "Recording waived today."

[4] Campbell also introduced two delayed disclosure articles written, in part, by Kamala London.

Dr. Bassman on delayed disclosure did not meet the threshold requirements of

*Daubert*; (d) expert testimony on this issue is not required to aid the jury; and, (e)

such testimony invades the province of the jury.  The trial court reserved as to the

admissibility of delayed disclosure evidence during the Commonwealth's rebuttal

(because Kentucky does not allow preemptive rebuttals), but *expressly* stated it

would also likely exclude that evidence when the question was properly before the

court.[5]  The Commonwealth appealed.

## ANALYSIS

The Commonwealth proffered expert testimony related to delayed

disclosure, *not* CSAAS as a whole.  In fact, on the stand, Dr. Bassman explicitly

stated that besides delayed disclosure, some of the other aspects of CSAAS "need

more research" before they can be validated.  The Commonwealth acknowledges

the theory of delayed disclosure was *first proposed* as a component of CSAAS, but

argues delayed disclosure theory has progressed as a stand-alone research topic

that has reached acceptance and validation within the medical/scientific

---

[5] "[The trial court] notes if the only grounds to introduce Dr. Stuart Bassman's testimony on 'delayed reporting' is the same as the Commonwealth's argument for introduction of his testimony in its case-in-chief, then this Court may rule in a similar manner, as such testimony would again be an attempt by the Commonwealth to label the minor [victim] as being a member of a class of sexual abuse victims based solely upon delayed reporting in an attempt to bolster her credibility.  This Court is persuaded that such generalizations may be helpful in child sexual abuse victims receiving proper counseling, but delayed reporting in and of itself does not prove the Defendant committed a crime.  As set forth above, this Court is of the opinion the Commonwealth may inquire with [victim] as to why she did not report more quickly[,] and the jury can weigh her testimony accordingly without the need for expert testimony."

community since its inception in 1983.  However, both the trial court and Campbell assert that as all CSAAS evidence is inadmissible in Kentucky, delayed disclosure testimony must also be inadmissible.  After reviewing the record and caselaw, we do not agree that delayed disclosure theory is bound by, ingrained with, and restricted to CSAAS and that syndrome's fate.  CSAAS and delayed disclosure are not synonymous, and we shall not treat them as such.  Nevertheless, CSAAS must be included within our analysis in order to explain the evolution of the applicable law.

First published in 1983 by Ronald Summit, M.D., ("Summit"), CSAAS was created as a tool to improve understanding of a child's coping strategies after being a victim of sexual abuse.  Summit, R.C., THE CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME, *Child Abuse Neglect*, 7(2), 177-93(1983), https://doi.org/10.1016/0145-2134(83)90070-4 (last visited Jul. 21, 2025).  CSAAS explains how sexually abused children often react to sexual abuse in "unexpected ways."  Rosemary L. Flint, *Child Sexual Abuse Accommodation Syndrome: Admissibility Requirements*, 23 AM. J. CRIM. L. 171, 174 (1995).

To be clear, CSAAS is not (nor was it intended to be) a *diagnostic* tool, *i.e.*, it did *not* claim that if a child manifested specific behaviors, the child must have been abused.  *See* London, Bruck, Ceci, Shuman, *supra*, at 194-226 (stating that Summit did not intend to imply the CSAAS reactions are present in all

-6-

abused children or that it should be treated as diagnostic of abuse); *see also Child sexual abuse accommodation syndrome*, PSYCHOLOGICAL AND SCIENTIFIC EVIDENCE IN CRIMINAL TRIALS § 8:9 (April 2025 Update) (". . . CSAAS is not a diagnostic syndrome. The syndrome does not detect sexual abuse.") (internal quotation marks and citations omitted).

Trial courts are the "gatekeepers" of evidence with a duty to keep out pseudo-science. *Miller v. Eldridge*, 146 S.W.3d 909, 913-14 (Ky. 2004) (quoting *Daubert*, 509 U.S. at 592-93 (footnote omitted)). Kentucky Rule of Evidence ("KRE") 104 grants a trial court the power to determine the preliminary admissibility of evidence. Kentucky courts have a broad range of evidentiary rules to consider in assessing the admissibility of an expert's scientific testimony. Such testimony may be admissible if: (1) the evidence is relevant (KRE 401); (2) the witness is qualified as an expert (KRE 702); (3) the trier-of-fact will be assisted (KRE 702); (4) the facts or data upon which the opinion is based are of a type reasonably relied upon by experts in the particular field in forming opinions upon the subject (KRE 703(a)); and (5) the probative value of the evidence is not outweighed by its prejudicial effect (KRE 403).

Specifically challenged here are the *Daubert* requirements of reliability and relevancy. *See Futrell v. Commonwealth*, 471 S.W.3d 258, 282 (Ky. 2015) (quoting *Daubert*, 509 U.S. at 597) ("[A] trial court's task in assessing

proffered expert testimony is to determine whether the testimony 'both rests on a

*reliable* foundation and is *relevant* to the task at hand.'") (emphasis added).

> When faced with the prospect of expert testimony under [KRE] 702, the general outline of the trial court's gatekeeping role is to ask whether the expert proposes to testify to scientific, technical, or other specialized knowledge that will assist the fact-trier in understanding or determining a fact in issue. This requires the trial court to discern whether the proposed testimony is both relevant and reliable.

*Luna v. Commonwealth*, 460 S.W.3d 851, 864 (Ky. 2015) (citations omitted). In

Kentucky, the trial court must *first* assess the reliability of the expert testimony (a

factual finding) and *then* evaluate its relevance. *Eldridge*, 146 S.W.3d at 914

(citation omitted). As reliability and relevance have different standards of review,

we will address each separately.

**A. Reliability**

We review the trial court's factual finding of *reliability* for clear error.

*See id.* (citing Lawson, R.G., THE KENTUCKY EVIDENCE LAW HANDBOOK § 6.20(6)

(4th ed. 2003)). Factual findings are clearly erroneous if unsupported by

substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (citation

omitted). The fact "[t]hat some scientists in a field disagree with an expert's

theories or conclusions does not render those theories or conclusions unreliable

under *Daubert*[.]" *Commonwealth v. Martin*, 290 S.W.3d 59, 68-69 (Ky. App.

2008) (quoting *United States v. Sullivan*, 246 F. Supp. 2d 696, 698 (E.D. Ky.

2003)) (second alteration in original); *see also Oliphant v. Ries*, 460 S.W.3d 889, 902 (Ky. 2015) (citation omitted) ("Unanimity of opinion is not required in order for an expert's opinion to be reliable. If that were the case, the court would have had to reject most, if not all, of the expert testimony. . . in nearly every other case with expert testimony. Disagreement by some, or even most, experts about the accuracy of a theory does not automatically render it unreliable.").

Here, the trial court *implied* the delayed disclosure evidence was not reliable, but failed to state as much *expressly*. Where a trial court failed to make express findings of fact about reliability, our clear error review must look at the record to see if there is substantial evidence to support the trial court's ruling. *Eldridge*, 146 S.W.3d at 917. In doing so, we look at the trial court's application of the non-exclusive, flexible factors set forth in *Daubert*. *See Martin*, 290 S.W.3d at 65-66 (citations omitted). The *Daubert* factors are not finite or exact; they are intended to be *possible* considerations in assessing the reliability of the expert testimony. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 578 (Ky. 2000) (citation omitted); *Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93, 104 (Ky. 2008) (citations omitted). The *Daubert* factors include:

> (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the

> theory or technique enjoys general acceptance within the relevant scientific, technical, or other specialized community.

*Goodyear Tire*, 11 S.W.3d at 578-79 (citing *Daubert*, 509 U.S. at 592-94).

On appeal, it is not our role to apply the *Daubert* factors *anew*. *See Eldridge*, 146 S.W.3d at 914-17 (citations omitted). To the contrary, we must give deference to the trial court's *Daubert* decisions because that court is "in the best position to evaluate first hand the proposed evidence." *Id.* at 914, 916 (citations omitted). We cannot simply reverse the trial court because we disagree with its result. *Id.* at 917. Rather, we must look at the record to see if there is substantial evidence to support the trial court's (implied) ruling of unreliability.

After review, we find there is *not* substantial evidence in the record to support the trial court's determination of unreliability. This is evident *from just one article*, the 2005 Study quoted by the trial court. In the order on appeal, the trial court did not mention the exhibits introduced by either party at the *Daubert* hearing, except the 2005 Study. The court did not discuss the details of the 2005 Study, but merely quoted two sentences from within the article's 32 pages.

The court quoted that there is "insufficient evidence to conclude whether expert testimony on delayed disclosure meets the *Daubert* standard of possessing probative value for jurors." Also, the court quoted, "In summary, there is no convincing evidence that CSAAS testimony on denial or recantation provides

relevant or reliable assistance to the fact finder to assess allegations of [child sexual assault]."

These two quoted sentences state the authors' legal conclusions about the overall admissibility of broad CSAAS evidence in the United States' court system. However, by quoting those sentences, the court appears to have misunderstood its role; the court's role was to assess the medical evidence for reliability – was the theory tested, was it reviewed by peers, were standard controls in place, is it accepted in the specialized community, *etc.* – not to adopt legally conclusory statements from a 2005 medical article. The *Daubert* question of reliability focuses "on methodology, not conclusions." *General Elec. Co. v. Joiner*, 522 U.S. 136, 154 (1997) (Stevens, J., concurrence in part). The Commonwealth introduced this article for its *medical research* related to delayed disclosure, specifically because it contributed to the *scientific conversation* around delayed disclosure.

This 2005 Study discusses the research of disclosure of child sexual abuse. The authors (from Johns Hopkins University, Cornell University, and Southern Methodist University) walk through delayed disclosure theory, its intentions, applications, and receptions within the medical community. It reviews and evaluates the existing empirical data and the scientific support for the behavioral components of delayed disclosure theory. It focuses on two major

sources of empirical data on children's disclosure patterns: (1) retrospective accounts from *adults* who claimed to have been abused as children, and (2) examinations of *children* undergoing sexual abuse evaluations. The article discusses the benefits and drawbacks of each source of that data and their distinctions on both scientific and applied grounds.[6]

The article goes on to discuss the predictors of nondisclosure. A review of Summit's original research *and two additional studies* concluded that child sexual abuse disclosure was more likely when the perpetrator was a stranger rather than a family member, but the age at the time of the abuse has not been consistently associated with failure to disclose. Additionally, the authors found that disclosure is related to the amount of fear or violence associated with the abuse, but not the severity of the abuse (based on six studies).

With regard to children evaluated for abuse, the article looks at delay of disclosure, denial, and recantation. Specifically about delay, as relevant here, the results with children were consistent with their adult counterparts: "when children do disclose, it often takes them a long time to do so." To reach this

_____

[6] In the order on appeal, the trial court stated that the Commonwealth's introduced studies did not have a sufficient number of test subjects. It is unclear what the court based this statement upon. Between these 11 studies (15,121 adults) and the 17 studies discussed below (4,924 children), there are more than 20,000 test subjects included in the 2005 Study *alone*.

conclusion, the authors referenced 17 studies (from 1993-2001) with the number of participants ranging in each study from 28 children to 1,535 children.

Our limited recitation of the information within the article does little to convey the breath, depth, and specificity of the research contained within its 32 pages. The 2005 Study's reference guide lists 125 sources, including clinician handbooks, peer-reviewed mental health publications, analyses from the American Psychological Association, and case studies across the United States and beyond our borders. Clearly, this article applied a balanced, broad approach to the delayed disclosure theory, compiled from a broad range of resources, tested and weighed through numerous varied studies, with controls in place, and rooted in specialized publications from within the field. Also, the specificity and technical nature of the analysis within the 2005 Study reinforces the impression that delayed disclosure theory is a specialized subject that would benefit from interpretation by an expert in the field. It is significant that Campbell challenges the science, not Dr. Bassman's expertise.[7]

---

[7] Dr. Bassman has a master's degree in Mental Health Services (1976) and a doctorate in Counselor Education (1983). He is a member of the American Psychological Association, American Professional Society on the Abuse of Children,® Association for the Treatment of Sexual Abusers, Kentucky Psychological Association, and Ohio Psychological Association. Dr. Bassman has been a practicing psychologist since 1985, is designated as an "Expert in Child Abuse" by the Ohio Attorney General's Office, and has given more than 75 presentations over 30 years on topics including sexual abuse, assessment and diagnosis, and domestic violence.

To find reliability, the trial court did not need to find proof of scientific certainty, nor was the trial court required to find that the evidence was scientifically *correct*. *Gunderson*, 279 S.W.3d at 105 (quoting *Brasher v. Sandoz Pharms. Corp*., 160 F. Supp. 2d 1291, 1296 (N.D. Ala. 2001)). Rather, reliability exists if the evidence is "trustworthy because it is tied to good scientific grounds." *Id*. "*Daubert* quite clearly forbids trial judges to assess the validity or strength of an expert's scientific conclusions, which is a matter for the jury." *Joiner*, 522 U.S. at 154 (Stevens, J., concurrence in part). Here, the trial court did not properly assess for reliability (*i.e*., the science's trustworthiness), and the trial court's finding/implication that the expert testimony was not reliable was not based on substantial evidence. Hence, the trial court's implied finding (that the delayed disclosure evidence was unreliable) is clearly erroneous.[8]

### B. CSAAS Relevancy & Admissibility

The question of relevance is whether the proposed testimony may assist the trier-of-fact in understanding the evidence or in determining a fact in issue. *Garrett v. Commonwealth*, 534 S.W.3d 217, 222 (Ky. 2017) (quoting *Eldridge*, 146 S.W.3d at 914). This is an admissibility determination that we

---

[8] We note, "reliability is a preliminary question of fact *reserved to the trial judge*," not an appellate court. *See Eldridge*, 146 S.W.3d at 916 (citations omitted) (emphasis added). As such, we do *not* find that the delayed disclosure evidence was "in fact" reliable, merely that the trial court did not support its implied finding of unreliability with substantial evidence.

review for an abuse of discretion. *Oliphant*, 460 S.W.3d at 897; *Goodyear Tire*, 11 S.W.3d at 578-79. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted).

Here, the trial court did not expressly state the delayed disclosure evidence was "not relevant," but the court did expressly state that this evidence would likely mislead the jury. However, Kentucky remains "powerfully inclusionary" in the presentation of evidence. *Roe v. Commonwealth*, 493 S.W.3d 814, 820 (Ky. 2015) (citing Lawson, R.G., THE KENTUCKY EVIDENCE LAW HANDBOOK § 2.05(2)(b) (4th ed. 2003)). Our rules of evidence permit *all relevant evidence* to be admissible (with some exceptions), and evidence is relevant if it has "any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (citing KRE 401, 402). A trial court's role is to keep out "junk science," not to supplant the adversarial trial process. *Martin*, 290 S.W.3d at 67-68 (citations omitted). Trial courts must be careful not to conflate questions of *admissibility* of expert testimony (a court finding) with the *weight* appropriately to be accorded such testimony by a fact finder (a jury determination). *Id.* at 68 (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996)).

-15-

The Commonwealth asserted that Dr. Bassman could enlighten the jury in an area beyond the average lay person's knowledge and assist the jurors in understanding the evidence. Dr. Bassman testified that *common perception* is that delay in reporting child sexual abuse equates to deception or dishonesty, but *the science* on the subject does not support that perception. Dr. Bassman testified that from his more than 40 years of experience, child victims of sexual abuse **do not** disclose the abuse *at the time* of the abuse.

Campbell states in his appellee brief that he is "entitled to use the defense 'the victim is lying' and base that on the alleged victim not reporting at a specific time." Campbell clearly correlated delay in the victim's disclosure to deceit and implied the victim's delay in disclosing the abuse was inconsistent with claims of sexual abuse. Campbell, not the Commonwealth, made the victim's delay a crucial fact. Moreover, the trial court acknowledged that the victim's delay was a crucial fact before the jury. Thus, we believe it was relevant. The court *expressly* invited Campbell to challenge the victim's credibility and implicitly validated Campbell's assertion that delay in disclosure could be indicative of a false report.

The last sentence in the order on appeal states, "[T]his Court is of the opinion the Commonwealth may inquire with [the victim] as to why she did not report more quickly[,] and the jury can weigh her testimony accordingly without

the need for expert testimony." However, a trial court should not improperly inject itself into the adversarial process or usurp the jury's function. *See Martin*, 290 S.W.3d at 68-69 (citations omitted).

"The gatekeeper role should not . . . invade the province of the jury, whose job it is to decide issues of credibility and to determine the weight that should be accorded evidence[.]" *Id*. at 68 (quoting *United States v. Vesey*, 338 F.3d 913, 917 (8th Cir. 2003)). While the trial court is the gatekeeper, the "gatekeeper alone does not protect the castle[.]" *Id.* (quoting *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)). A party confronted with an adverse expert witness should utilize cross-examination to highlight weaknesses and/or call their own expert in rebuttal. *Id.*; *Eversole v. Commonwealth*, 600 S.W.3d 209, 220 (Ky. 2020) (citing *Minter v. Commonwealth*, 415 S.W.3d 614, 618 (Ky. 2013)). A *jury* should be permitted to consider conflicting testimony in order to fully weigh the evidence. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (It is for the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."). And in Kentucky, we have faith that our juries can perform their duties accordingly. *See Martin*, 290 S.W.3d at 67-69 (citations omitted).

The trial court determined Dr. Bassman's testimony would mislead the jury, but to the contrary, the court's one-sided approach to the delay evidence is more likely to mislead the jury and inappropriately encroached upon the jury's fact-finding role. Here, the trial court concluded the *jury* could weigh one side of the argument (Campbell's), while the *court* weighed the other side (Commonwealth's). Yet, even though the trial court exceeded its gatekeeping role, Kentucky caselaw on general admissibility of CSAAS evidence requires us to affirm.

Summit published CSAAS in 1983. Two years later, in 1985, our Kentucky Supreme Court first addressed its admissibility. *Bussey v. Commonwealth*, 697 S.W.2d 139 (Ky. 1985). In *Bussey*, our Supreme Court held that the CSAAS testimony was improperly admitted *to show the defendant's guilt* because (a) the prosecution did not establish the credibility of the syndrome as generally accepted in the medical community, and (b) the fact that the victim showed a symptom of CSAAS was not indicative of guilt because that symptom could have been the result of the victim's prior abuse by parties other than the defendant. *Id*. at 141.

In the decades that followed, our Supreme Court remained consistent with *Bussey* and held that CSAAS testimony is not admissible to establish *the guilt* of a defendant or *the existence* of sexual abuse. *See Mitchell v. Commonwealth*,

777 S.W.2d 930, 932-33 (Ky. 1989) (finding CSAAS symptom testimony lacks probative value to establish *the existence of sexual abuse* because children who have **not** been sexually abused often exhibit one or more symptoms of CSAAS); *Hellstrom v. Commonwealth*, 825 S.W.2d 612, 613-14 (Ky. 1992) (holding CSAAS, at that time, had not been recognized as scientifically reliable in *diagnosing* child sexual abuse); *Newkirk v. Commonwealth*, 937 S.W.2d 690, 693 (Ky. 1996) (stating, in part, that in 1996 CSAAS had not yet "attained general acceptance in the scientific community justifying its admission into evidence *to* prove the existence of sexual abuse or the identity of the perpetrator") (emphasis added); *Kurtz v. Commonwealth*, 172 S.W.3d 409, 413-14 (Ky. 2005) (finding a mental health counselor's testimony – that the defendant acted consistently with other perpetrators of child sexual abuse – was improperly admitted *to prove the guilt of the defendant* during the Commonwealth's case-in-chief); *King v. Commonwealth*, 472 S.W.3d 523, 526-30 (Ky. 2015) (holding the delayed disclosure testimony was improperly admitted because the validity of CSAAS was not self-evident nor validated through a *Daubert* analysis).

In sum, we are not at liberty to overrule the established precedent set by our Kentucky Supreme Court or its predecessor court. *See Kindred Healthcare, Inc. v. Henson*, 481 S.W.3d 825, 829 (Ky. App. 2014) (citing Kentucky Supreme Court Rule 1.030(8)(a)). Clearly, Kentucky courts have not permitted general

-19-

CSAAS testimony – *i.e.*, broad testimony about typical reactions of child sexual abuse victims – in the Commonwealth's case-in-chief *to prove the guilt* of a defendant or to establish *the existence of sexual abuse*. Therefore, the trial court did *not* abuse its discretion by prohibiting the Commonwealth from proffering general CSAAS testimony during its case-in-chief to prove Campbell's guilt or the existence of sexual abuse.

### C. Delayed Disclosure Relevancy & Admissibility

However, the remaining question on appeal requires more exactitude/specificity because the Commonwealth is not only proffering *general* CSAAS testimony to *prove Campbell's guilt* or to *establish the existence of sexual abuse*. Instead, the remaining question on appeal is more nuanced: Assuming it satisfies the *Daubert* threshold requirements, is Dr. Bassman's expert testimony about delayed disclosure admissible in rebuttal *if* Campbell first argues that the victim's delay in disclosing the abuse is indicative of a false report? Unfortunately, our answer cannot be more specific than: *maybe*.

While much has yet to be determined at trial, we find further discussion appropriate because the order on appeal overtly stated the court's intention to prohibit delayed disclosure testimony on rebuttal:

> This Court, at the present, is not persuaded by the Commonwealth's arguments that Dr. Bassman's testimony is needed in rebuttal even if the defense is something to the effect that "since [the victim] did not

-20-

report at a specific time, then she must be lying." Such defenses that the victim is lying are always available to a [Campbell]. The Court notes people lie, and children lie. This in and of itself is not sufficient in the Court's opinion to allow the Commonwealth to introduce Dr. Bassman's testimony as to delayed reporting even in the Commonwealth's rebuttal evidence. The Court is of this opinion based upon the holding in *Sanderson* [*v. Commonwealth*, 291 S.W.3d 610 (Ky. 2009)]. In other words, no introduction of the factors of CSAAS may be introduced.

The trial court relied mainly on *Sanderson*, *supra*, for its contention that "no mention of CSAAS is permitted." 291 S.W.3d 610. The trial court interpreted this prohibition on CSAAS testimony as a complete ban on all the syndrome's *original* theories, including delayed disclosure testimony. However, as discussed, the two – CSAAS and delayed disclosure – are not synonymous. The Commonwealth asserts that the research on delayed disclosure has reached an independent level of scientific validation that CSAAS theory, as a whole, has not. In essence, the Commonwealth contends that we must not discard the bushel but for a few bad apples; we must examine each apple individually before we delegate each to our expert pie or relegate each to the trash. As such, we must now examine our precedent *not* in the context of CSAAS generally, but rather, specifically about delayed disclosure.

In *Sanderson*, *supra*, the defendant was indicted for sodomy and sexual abuse. *Id.* at 611. During the Commonwealth's case-in-chief, a clinical psychologist testified

> that it is normal for child victims of sexual abuse, like [the victim here], to add details about their abuse after they have been in counseling for an extended period of time and to appear happy in their outward life and be able to excel in their extracurricular activities and make good grades. The Commonwealth even asked whether what [the psychologist] described as a child's attempt to disconnect from such abuse is the reason sexually-abused girls become prostitutes.

*Id.* at 614.

The Court held "[the psychologist's] 'expert' testimony in this case, coupled with the Commonwealth's speculation about the creation of prostitutes, are the exact type of *generic* and unreliable evidence this Court has repeatedly held to be reversible error." *Id.* (emphasis added). *Sanderson* is distinguishable from the case *sub judice* in numerous ways.

First, the expert testimony in *Sanderson* pertained to general, broad CSAAS testimony. *Id.* at 612-14. The expert discussed how various generic characteristics displayed by that particular alleged victim were "normal," and the expert speculated about why some victims later become prostitutes. *Id.* at 614. Conversely, the expert testimony on review here is more limited in scope, did not

express a personal opinion about this victim's truthfulness, and did not rest on speculation.

Second, the testimony in *Sanderson* was not likely helpful for a jury. The expert in *Sanderson* discussed generic personality traits that children who have been victims of sexual abuse *might* display, but the Court therein noted that those traits *also* existed in children who had not been similarly abused. *Id.* at 613-14. It was not clear how this would be helpful for a jury to understand a fact at issue. Conversely, the expert opinion in question here is relevant to assist the jury in understanding the evidence, *i.e.*, the implications of delay as explained by scientific research. Dr. Bassman testified that such implications are contrary to common perceptions and hence, an expert is necessary and helpful in explaining the science to a layperson jury.

Third, it appears that in *Sanderson* the expert testimony was proffered to help establish the *existence* of sexual abuse and the defendant's *guilt*. *Id.* at 612-14. Again, CSAAS evidence has long been prohibited in Kentucky if proffered for these purposes. *Newkirk*, 937 S.W.2d at 693; *Kurtz*, 172 S.W.3d at 413-14; *King*, 472 S.W.3d at 526-30. Conversely, here, the evidence is not being proffered to establish guilt or existence of abuse, but merely to explain what science tells us about delay *if* Campbell *first* kicks open that door.

Fourth, it does not appear the expert testimony in *Sanderson* survived an examination through the *Daubert* factors (it is not clear if the court held a *Daubert* hearing). *See generally* 291 S.W.3d 610. In fact, the Supreme Court's use of quotation marks when referring to the "expert" leads us to believe the "expert's" credentials and testimony were not thoroughly vetted. *See id.* at 614. Conversely, here, Dr. Bassman's credibility was not challenged, and his expertise in the field was clearly established through a *Daubert* hearing.

Nevertheless, *Sanderson*'s discussion of precedent is more pertinent here than the holding itself. *Sanderson* quotes the "basic rule against CSAAS testimony" from *Kurtz*:

> [W]here a victim had delayed reporting of abuse, we held improper the testimony of a seasoned child sex abuse investigator stating that it was common, in her experience, for sexually abused victims to delay reporting of the abuse. . . . We held that "*a party cannot introduce evidence of the habit of a class of individuals either to prove that another member of the class acted the same way under similar circumstances or to prove that the person was a member of that class because he/she acted the same way under similar circumstances.*"

*Sanderson*, 291 S.W.3d at 613 (quoting *Kurtz*, 172 S.W.3d at 414) (emphasis added). Here, the trial court interpreted that quote as prohibiting all delayed disclosure evidence as improper class testimony. While we agree with the italicized rule within the above citation, we do not agree with this trial court's interpretation and application of that rule.

First, as discussed, *Sanderson* is quite distinct and distinguishable from the matter before us.

Second, Dr. Bassman's testimony was not generic class evidence. Dr. Bassman was not asserting that because the victim showed certain signs, she therefore must have been abused. Nor was Dr. Bassman testifying that the defendant must be guilty because he showed traits consistent with, and/or similar to, other known predators. Rather, the Commonwealth proffered Dr. Bassman's testimony merely to rebut Campbell's specific claim that delayed disclosure indicated deceit. Dr. Bassman's testimony was intended to give *the jury a tool to use in evaluating* whether that particular victim was being truthful about what happened or if she made up the accusation later for some other purpose.

We are *not* suggesting the use of improper bolstering (vouching) testimony. True, after a witness's credibility has been attacked, bolstering testimony may be admissible. *Tackett v. Commonwealth*, 445 S.W.3d 20, 32-33 (Ky. 2014) (citing *Brown v. Commonwealth*, 313 S.W.3d 577, 628 (Ky. 2010)). However, even after a credibility attack, witnesses (including experts) cannot *vouch* for the truthfulness of another witness either directly or indirectly. *Stephens v. Commonwealth*, 680 S.W.3d 887, 900 (Ky. 2023) (citing *Hoff v. Commonwealth*, 394 S.W.3d 368, 376 (Ky. 2011)).

An expert may testify that based on experience not all children disclose "every time[.]" *Finch v. Commonwealth*, 681 S.W.3d 84, 96 (Ky. 2023) (within a bolstering context, our Supreme Court held a forensic interviewer's testimony was not improper when she stated that based on her 2,000 forensic interviews, victims of child sexual abuse did not disclose "every time" he/she is asked). Yet, an expert may *not* make reference to *this* victim's character for truthfulness or state a personal belief that *this* victim was telling the truth. *Id.*; *Stephens*, 680 S.W.3d at 903-04. The expert opinion must not endorse a witness's testimony, but rather, the expert opinion must be proffered to help the jury understand the evidence. Expert testimony should focus on interpreting the science *so the **jury** can assess the credibility* of the victim, because witness credibility falls within the *sole purview of the jury* as the trier-of-fact. *Martin*, 290 S.W.3d at 68-69.

Thus, the Commonwealth could proffer Dr. Bassman's testimony to explain the research and science behind delayed disclosure, but he could *not* assert that *this* victim was telling the truth or that he believed *this* victim. In order to be admissible, instead of stating his opinion about this victim's truthfulness, he would have to give the jury a tool to use as *they, the jurors*, evaluated whether this particular victim was being truthful about what happened.

Third, the expert in *Kurtz, supra*, (the case cited by *Sanderson*) testified that perpetrators of child sexual abuse tended to "possess certain common characteristics[,]" and the defendant in that case showed those characteristics; therefore he must be guilty. *Kurtz*, 172 S.W.3d at 411-14. The *Kurtz* Court held that the expert's CSAAS testimony "unmistakably touched on both the habits and the profile characteristics of that class of individuals [child sexual predators] which we have held is not relevant or permissible for the jury to consider during the Commonwealth's case-in-chief." *Id*. at 414. In essence, the *Kurtz* Court again held that CSAAS cannot be used for *generic, class-consistency* testimony to *establish the guilt* of a criminal defendant. *Id.* In the matter before us, we have neither *generic testimony* about common characteristics of predators, nor expert testimony attempting to establish *the guilt of the defendant* through such testimony.

Fourth, this rule cited in *Sanderson* and *Kurtz* is rooted in *Johnson v. Commonwealth*, 885 S.W.2d 951, 953 (Ky. 1994).[9] *Johnson* created this rule from KRE 404(b) and was applying the rule to a *criminal defendant* (in the context of guilt/innocence), **not** a child victim *witness* (in rebuttal). *Id.* at 953 (citing KRE 404(b)). KRE 404(b) prohibits, with two exceptions, evidence of other bad acts

---

[9] *Sanderson* adopted this rule from *Kurtz*. *Sanderson*, 291 S.W.3d at 613 (quoting *Kurtz*, 172 S.W.3d at 414). *Kurtz* adopted this rule from *Miller v. Commonwealth*. *Kurtz*, 172 S.W.3d at 414 (quoting *Miller v. Commonwealth*, 77 S.W.3d 566, 571-72 (Ky. 2002)). *Miller* adopted this rule from *Johnson*. *Miller*, 77 S.W.3d at 571-72 (quoting *Johnson*, 885 S.W.2d at 953).

"to prove the character of a person in order to show action in conformity therewith."

In *Johnson*, the defendant was driving a loaded coal truck on an open access four-lane highway. *Id.* at 952. As the defendant was approaching an intersection, he "looked briefly from the road" at the same time another vehicle was entering the intersection. *Id.* Upon seeing the other vehicle, the defendant sounded his horn, slammed on his brakes, and veered hard to the left to avoid a collision. *Id.* The defendant's coal truck left 25 feet of skid marks before colliding with the other vehicle. *Id.* The driver of the other vehicle was killed instantly. *Id.* Despite no evidence being introduced that the defendant was driving in excess of the legal speed limit or under the influence of alcohol or drugs, he was convicted of wanton murder and sentenced to 20 years of imprisonment. *Id.* The defendant appealed. *Id.*

On appeal, our Supreme Court reversed and remanded the case for a new trial with lesser included offenses. *Id.* at 954. In part, the Supreme Court held that the trial court erred by allowing cross examination "concerning the alleged practice of coal truck drivers deliberately running red lights." *Id.* at 953. The Court stated:

> To permit the Commonwealth to cross examine about the habit of a class of individuals for the purpose of showing how one unique individual in that class might have acted on a given occasion would invite the jury to arbitrarily

-28-

> hold an individual responsible based on his membership in the class. [Because] evidence of a person's own habits or his own prior bad acts has always been inadmissible in the Courts of Kentucky, this Court establishes that evidence regarding the habit of or bad acts of a class of individuals should also be inadmissible.

*Id.*

Clearly, the rule as applied in *Johnson*, stated that the guilt of a criminal defendant cannot be established through class evidence. Once more, we do not have such class testimony, nor is the expert testimony in question being used to establish Campbell's guilt. Thankfully, *King*, *supra*, is immensely helpful (albeit distinguishable) for our analysis.

In *King*, a detective testified that it was "very rare" for children to immediately report sexual abuse, and sometimes child victims do not report until "years after the event." 472 S.W.3d at 527. After the defendant was convicted of sodomy and sexual abuse, he appealed and, in part, challenged this testimony. *Id.* at 524. On appeal, our Supreme Court determined this testimony was improperly admitted – not because CSAAS was "demonstrably wrong" – but rather, because the Commonwealth did not establish or "attempt[] to prove at a *Daubert* hearing the scientific reliability and validity of the CSAAS theory." *Id.* at 530. The *King* distinctions abound.

First, the detective in *King* did not cite any scientific studies or other data to support her assertions. *Id.* at 527. Nor did the Commonwealth attempt to

prove at a *Daubert* hearing the scientific reliability and validity of CSAAS and/or delayed disclosure theory. *Id.* at 530. Here, we have both a *Daubert* hearing and a well-supported expert.

Second, in 2015, the *King* Court treated delayed disclosure testimony as synonymous with CSAAS theory. *See generally id.* Here, a decade later, Dr. Bassman overtly stated that CSAAS as a whole has *not* reached scientific validation, but asserted that delayed disclosure *has* reached scientific acceptance as an independent, **autonomous** theory.

Third, the delayed disclosure evidence in *King* was presented to bolster the Commonwealth's case, *i.e.*, to help *establish the existence of sexual abuse and the defendant's guilt*. In *King*, during the trial, the defendant "never claimed that [the alleged victim's] delayed report to his mother was indicative of a false report." *Id.* at 527. "Therefore, it [could not] be claimed that [the detective's] statement was admissible to refute an attack on [the alleged victim's] credibility based on the delay in his report." *Id.* Clearly, the same is not true here. Campbell readily admits his intention to attack the victim's credibility, to imply the delay in her disclosure demonstrated deceit, and to argue the delay indicated the report of sexual abuse was false.

It bears repeating, the majority in *King* stated:

To be clear: we have *never* ruled the [CSAAS] theory to be inadmissible because it is demonstrably wrong; rather,

-30-

we have ruled it inadmissible because no one has offered proof of its validity. That ruling is not likely to change unless proponents of the theory provide proof of the relevant factors weighing on the theory's credibility.

*Id.* at 530.

Here, we <u>have</u> proof of the relevant factors weighing on delayed disclosure theory's credibility. Loosely echoing the guidance in Justice Scott's dissent in *Sanderson* and Justice Abramson's dissent in *King*,[10] we believe the Commonwealth now has *likely* presented the pieces it needs to introduce expert testimony about delayed disclosure evidence: if the science survives a *Daubert* analysis – proffered for the limited purpose of helping the jury understand the evidence – through delayed disclosure research, not victim-specific bolstering testimony – if the defense first argues the delay in the victim's reporting is indicative of a false report.

The trial court made statements, suggesting future rulings, in the order on appeal that required further analysis by this Court.[11] We note, the

---

[10] Justice Scott asserted that limited CSAAS testimony should be permitted "for rehabilitation purposes only and with an accompanying admonition limiting the use to such purpose." *Sanderson*, 291 S.W.3d at 622 (Scott, J., dissenting). Justice Abramson asserted general CSAAS evidence could be introduced "for the purpose of rehabilitating the credibility of a child victim. Of course, the expert offering CSAAS testimony would be prohibited from commenting on the particular victim's behavior. Not only is this a fair approach, it is a logical one – where else do we allow a witness's credibility to be destroyed without recourse to rehabilitation?" *King*, 472 S.W.3d at 536 (Abramson, J., dissenting).

[11] "[The trial court] notes if the only grounds to introduce Dr. Stuart Bassman's testimony on 'delayed reporting' is the same as the Commonwealth's argument for introduction of his

Commonwealth is permitted this appellate review (of a circuit court order excluding an expert witness) prior to trial. *See*, *by e.g.*, *Martin*, 290 S.W.3d 59. Additionally, we find this review to be timely and appropriate because if the trial had proceeded with the Commonwealth's expert excluded, and a jury had found Campbell not guilty, there would have been no avenue for appeal by the Commonwealth at that time. The Commonwealth is constitutionally barred from appealing criminal acquittals. *Maupin v. Commonwealth*, 542 S.W.3d 926, 928-30 (Ky. 2018) (quoting KENTUCKY CONSTITUTION §115). As Campbell's trial has not yet occurred, and arguments may further evolve, our review is restricted to the findings and conclusions within the order on appeal, and a more definitive holding on delayed disclosure would not be appropriate at this time. However, it is hoped that this discussion will be of some guidance to the parties and court below in the future proceedings.

**CONCLUSION**

Kentucky courts do not permit general CSAAS testimony – *i.e.*, broad testimony about typical reactions of child sexual abuse victims – in the Commonwealth's case-in-chief *to prove the guilt* of a criminal defendant or to

---

testimony in its case in chief, then this Court may rule in a similar manner as such testimony would again be . . . an attempt to bolster her credibility. . . . [T]he Commonwealth may inquire with [victim] as to why she did not report more quickly[,] and the jury can weigh her testimony accordingly without the need for expert testimony."

establish *the existence of sexual abuse*.  Hence, the trial court did *not* abuse its discretion in prohibiting the Commonwealth from proffering broad CSAAS testimony in its case-in-chief.  Inasmuch, we AFFIRM the Graves Circuit Court.

However, we conclude that the trial court did err in suggesting that the expert testimony on delayed disclosure was unreliable and not relevant.  To the contrary, we believe the Commonwealth's argument – that Dr. Bassman's testimony could enlighten the jury in an area beyond the average lay person's knowledge and assist the jury in understanding the evidence – is quite compelling.

We make no final determination as to the admissibility of delayed disclosure expert testimony in the Commonwealth's rebuttal, although most states have opened the door to some admission.[12]  Notably, if at trial the defense argues

---

[12] Authoritative caselaw from other jurisdictions may be considered when determining the reliability of science.  *Fugate v. Commonwealth*, 993 S.W.2d 931, 937 (Ky. 1999).  Interestingly, it appears we may be one of only three states (Kentucky, Tennessee, Rhode Island) who have not yet opened the door to admit some form of expert testimony related to delayed disclosure by child sexual abuse victims.  *See, e.g*., remaining states in alphabetical order:  *W.R.C. v. State*, 69 So. 3d 933, 939-40 (Ala. Crim. App. 2010) (citations omitted); *Hayes v. State*, 474 P.3d 1179, 1188 (Alaska App. 2020) (citations omitted); *State v. Salazar-Mercado*, 325 P.3d 996, 1000 (Ariz. 2014) (citations omitted); *McDaniel v. State*, 708 S.W.3d 386, 396-97 (Ark. App. 2025) (citations omitted); *People v. Perez*, 105 Cal.Rptr.3d 749, 760 (Cal. App. 2010) (citations omitted); *People v. Short*, 425 P.3d 1208, 1214-15 (Colo. App. 2018) (citations omitted); *State v. Francis D*., 815 A.2d 191, 202 (Conn. App. 2003) (citations omitted); *Floray v. State*, 720 A.2d 1132, 1135 (Del. 1998) (citations omitted); *Oliver v. State*, 977 So. 2d 673, 677 (Fla. 5th DCA 2008) (citations omitted); *Chamberlain v. State*, 819 S.E.2d 303, 310 (Ga. App. 2018) (citations omitted); *State v. McDonnell*, 409 P.3d 684, 695-96 (Haw. 2017) (citations omitted); *State v. Dutt*, 73 P.3d 112, 118 (Idaho Ct. App. 2003) (citations omitted); *People v. Atherton*, 940 N.E.2d 775, 789-93 (Ill. App. 2010) (citations omitted); *Ward v. State*, 203 N.E.3d 524, 530-32 (Ind. Ct. App. 2023) (citations omitted); *State v. Leedom*, 938 N.W.2d 177, 192-93 (Iowa 2020) (citations omitted); *State v. McIntosh*, 58 P.3d 716, 728-30 (Kan. 2002) (citations omitted); *State v. Hampton*, 136 So. 3d 240, 245-48 (La. App. 2014) (citations omitted); *State v. Robshaw*, 2025 ME 50 ¶ 7-11, 2025 WL 1689722, – A.3d – (Me. Jun. 17, 2025) (citations omitted); *Reimundo v.*

that the victim's delay (in reporting the abuse) is indicative of a false report, as has been suggested, we see a *narrow* path in which the trial court could properly admit Dr. Bassman's expert testimony in rebuttal.

ALL CONCUR.

*State*, 2022 WL 2230892, at \*7-10 (Md. Ct. Spec. App. June 21, 2022) (citations omitted); *Commonwealth v. Bougas*, 795 N.E.2d 1230, 1236 (Mass. App. Ct. 2003) (citations omitted); *People v. Peterson*, 537 N.W.2d 857, 870-71, (Mich. 1995) (citations omitted); *State v. Reyes*, 890 N.W.2d 406, 412-13 (Minn. App. 2017) (citations omitted); *Hobgood v. State*, 926 So. 2d 847, 855-56 (Miss. 2006) (citations omitted); *State v. Suttles*, 581 S.W.3d 137, 150-54 (Mo. App. 2019) (citations omitted); *State v. Morgan*, 968 P.2d 1120, 1123-24 (Mont. 1998) (citations omitted); *State v. Corral*, 20 N.W.3d 372, 412-14 (Neb. 2025) (citations omitted); *Smith v. State*, 688 P.2d 326, 326-27 (Nev. 1984) (citation omitted); *State v. DeCosta*, 772 A.2d 340, 343-44 (N.H. 2001) (citations omitted); *State v. Schnabel*, 952 A.2d 452, 462 (N.J. 2008) (citations omitted); *State v. Newman*, 784 P.2d 1006, 1009-10 (N.M. App. 1989) (citations omitted); *People v. Bassett*, 55 A.D.3d 1434, 1436-37 (N.Y. 2008) (citations omitted); *State v. Shore*, 814 S.E.2d 464, 471-74 (N.C. App. 2018) (citations omitted); *State v. Tibor*, 738 N.W.2d 492, 497-99 (N.D. 2007) (citations omitted); *State v. Svoboda*, 180 N.E.3d 1277, 1299-1302 (Ohio App. 2021) (citations omitted); *Davenport v. State*, 806 P.2d 655, 658-660 (Okla. Crim. App. 1991) (citations omitted); *State v. Perry*, 218 P.3d 95, 97-104 (Or. 2009) (citations omitted); *Commonwealth v. Jones*, 240 A.3d 881, 895-97 (Pa. 2020) (citations omitted); *State v. Galloway*, 904 S.E.2d 866, 872 (S.C. 2024) (citations omitted); *State v. Buchholtz*, 841 N.W.2d 449, 460 (S.D. 2013) (citations omitted); *Hernandez v. State*, 53 S.W.3d 742, 750-52 (Tex. App. 2001) (citations omitted); *State v. Wright*, 304 P.3d 887, 900-01 (Utah App. 2013) (citations omitted); *State v. Hammond*, 54 A.3d 151, 161-62 (Vt. 2012) (citations omitted); *Cruz v. Commonwealth*, 915 S.E.2d 318, 326-31 (Va. App. 2025) (citations omitted); *State v. Hakimi*, 98 P.3d 809, 813-14 (Wash. App. 2004) (citations omitted); *State v. Edward Charles L.*, 398 S.E.2d 123, 141 (W.Va. 1990) (citations omitted); *State v. Johnson*, 990 N.W.2d 174, 187-88 (Wis. 2023) (citations omitted); *Frenzel v. State*, 849 P.2d 741, 749 (Wyo. 1993) (citations omitted).

BRIEFS FOR APPELLANT:  BRIEF FOR APPELLEE:

Russell Coleman    Emily Ward Roark
Attorney General of Kentucky Paducah, Kentucky

J. Grant Burdette    C. Tyler Brown
Assistant Attorney General  Paducah, Kentucky
Frankfort, Kentucky